IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| THOMAS L. TAYLOR III, SOLELY IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR KALETA CAPITAL MANAGEMENT, INC., BUSINESSRADIO NETWORK, L.P., d/b/a BizRadio and DANIEL FRISHBERG FINANCIAL SERVICES, INC., d/b/a DFFS CAPITAL MANAGEMENT, INC., | § § § § § § § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 4:12-cv-1491 |
| DANIEL S. FRISHBERG, ELISEA T. FRISHBERG, ALBERT F. KALETA, BARRINGTON FINANCIAL ADVISORS, INC. and WILLIAM C. HEATH, | § § § § § § | |
| Defendants. | § | |

### RECEIVER'S OBJECTION TO THE DECLARATION OF DANIEL FRISHBERG AND MOTION TO STRIKE

Plaintiff Thomas L. Taylor III ("Receiver"), in his capacity as Court-appointed Receiver[1] for Kaleta Capital Management, Inc. ("KCM"), BusinessRadio Network, L.P. d/b/a BizRadio ("BizRadio"), Daniel Frishberg Financial Services, Inc., d/b/a DFFS Capital Management, Inc. ("DFFS") and all entities they own or control (collectively the "Receivership Entities"), files this Objection to the Declaration of Daniel Frishberg and Motion to Strike, and would show the Court as follows:

---

[1] Appointed in the action styled *Securities and Exchange Commission v. Albert Fase Kaleta, et al.*, Civil Action No. 4:09-cv-03674, in the United States District Court for the Southern District of Texas, Houston Division (the "Enforcement Action"). *See* Docs. # 7, 34 therein.

I. **PRELIMINARY STATEMENT**

The Receiver commenced the above-styled lawsuit against, *inter alia*, Daniel Frishberg ("Frishberg"), alleging, *inter alia*, that Frishberg negligently managed the Receivership Entities BizRadio and DFFS and breached the fiduciary duties of loyalty and care which he owed to those entities, and that his mismanagement proximately caused significant damages to BizRadio and DFFS. *See* Doc. # 1. The damages for which the Receiver alleges Frishberg is liable are now borne by the Receivership Estate.

On October 15, 2013 the Receiver moved by motion and brief for entry of partial summary judgment against Frishberg (the "Motion," Doc. # 26 and the "Brief," Doc. # 27) pursuant to Rule 56 of the Federal Rules of Civil Procedure (the "Rules"). Frishberg filed and served his response to the Motion on November 16, 2013 (Doc. # 35, the "Response"). In his Response, Frishberg consistently cited to the Declaration of Daniel Frishberg (Doc. # 35-3, the "Frishberg Declaration") in support of his Response. The Frishberg Declaration, however, is defective in several respects, in that it lacks adequate citation to the record for support, when citation is made at all, and it is filled with self-serving, conclusory assertions which are unsubstantiated and speculative at best. The Frishberg Declaration does not conform to the requirements of Rule 56(c) and the Receiver moves to strike it as further detailed below. To the extent that the Court grants this Motion to Strike, the assertions by Frishberg which are stricken should be treated as unaddressed, and therefore undisputed, in accordance with Rule 56(e).

II. **ARGUMENT**

The Court of Appeals for the Fifth Circuit has repeatedly and consistently held that self-serving, conclusory assertions are not adequate to support a response to a motion for summary judgment. The Court of Appeals stated in *Mosley v. White*, 464 Fed. Appx. 206 (5th Cir. 2010)

that while affidavits "constitute valid summary judgment evidence, we have explained that without more, 'conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden' and defeat a motion for summary judgment." *Id*. at 213 (quoting *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996)) (internal citation omitted); see also *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 531 (5th Cir. 2005); *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001) ("self-serving allegations are not the type of 'significant probative evidence' required to defeat summary judgment"); *BMG Music v. Martinez*, 74 F.3d 87, 91 (5th Cir. 1996) (affirming summary judgment where "the only evidence in support of the defendants' theory is a conclusory, self-serving statement by the defendant").

Furthermore, Rule 56(e) states that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … (2) consider the fact undisputed for purposes of the motion … or (4) issue any other appropriate order."  FED. R. CIV. P. 56(e).  Affidavits filed in support or opposition to Motions under Rule 56 "must be made on personal knowledge," and "set out facts that would be admissible in evidence…"  FED. R. CIV. P. 56(c)(4).  Moreover, a nonmovant who asserts that a fact is genuinely disputed must support his assertion by "citing to particular parts of materials in the record," or "showing that the materials cited [by the movant] do not establish the absence … of a genuine dispute…."  FED. R. CIV. P. 56(c)(1).

The Frishberg Declaration not only is filled with self-serving, "conclusory allegations, speculation, and unsubstantiated assertions," but it otherwise fails to meet the requirements of summary judgment evidence as detailed in Rule 56(c), and therefore must be stricken from the record and from consideration in regard to Frishberg's Response.

a. **The Frishberg Declaration Contains a Plethora of Self-serving and Conclusory Assertions**

The Frishberg Declaration is full of assertions which are self-serving, conclusory, unsubstantiated and speculative, and which are inadequate under the Rules and Fifth Circuit precedent to support Frishberg's Response.  *See White*, 464 Fed. Appx. at 213; *Lawrence*, 276 F.3d at 197.

In this regard, these assertions cannot be considered in deciding the Receiver's Motion nor may they be considered as creating a dispute as to material facts established by the Receiver in the Motion.  The following assertions must be stricken as self-serving, conclusory, unsubstantiated and speculative:

1. "I specifically and unequivocally state that I had no connection to the management or operation of KCM and that it was not an alter ego of me or of my company." (Frish. Decl. at p. 4);

2. "I state unequivocally that Biz radio was not operated as a 'loss leader.'" (Frish. Decl. at p. 9);

3. "I state unequivocally that 1. I did not know that these notes were being made, 2. that I did not sign them, and 3. that I did not authorize anyone to create a stamp of my signature." (Frish. Decl. at p. 11); and

4. "I had no way to know and did not know that Gunn and Joao were being misused for Kaleta's private purposes." (Frish. Decl. at p. 18).

b. **The Frishberg Declaration Does not Conform to Rule 56(c)**

1) *Inadequate Citation Pursuant to Rule 56(c)(1)*

The Frishberg Declaration fails adequately to cite to the record in regard to assertions made therein.  A nonmovant who asserts that a fact is genuinely disputed must support his assertion by "citing to particular parts of materials in the record," or "showing that the materials cited [by the movant] do not establish the absence … of a genuine dispute…."  FED. R. CIV. P.

56(c)(1). Frishberg has failed to do so and all such assertions should be stricken from the record. These assertions are as follows:

1. Frishberg refers to several "claims" allegedly made by the Receiver in the Motion which Frishberg attempts to refute. Frishberg does not cite to the Motion at all, let alone with any particularity, as to where in the Motion these claims were made, or as to the language used in the Motion to assert the facts claimed (which is particularly important in order to judge the language used by Frishberg to frame the purported claim of the Receiver). Without particular citation to the Motion as to the claims which Frishberg attempts to refute, his assertions which purport to refute the Receiver's claims cannot be considered and must be stricken. These "claims" include the following:

    a. "(The receiver implies that there was something wrong with this loan source, for reasons which he does not explain.[)]" (Frish. Decl. at p. 1);

    b. "(Claim - The Receiver asserts FJS needed hundreds of thousands of dollars a year to survive)" (Frish. Decl. at p. 3);

    c. "(Claim - The receiver suggests that KCM was an alter ego of me personally, or a shell game, implying that that company was interchangeable with FJS and or me personally.)" (Frish. Decl. at p. 3);

    d. "(The Receiver confuses the story by equating those early times when FJS had a smaller amount under management and was earning fees that ran between $1 and $1.4 million per year, with later times when the firm was self-sufficient.[)] (See exhibits 10 and 11)" (Frish. Decl. at p. 4);

    e. "(The Receiver claims that I Knew KCM was lending client money to FJS.)" (Frish. Decl. at p. 6);

    f. "(The Receiver claims that I was negligent in that I was warned about Kaleta dishonesty.)" (Frish. Decl. at p. 7);

    g. "(The Receiver Claims that I was negligent in allowing Kaleta to engage in what later turned out to be alleged fraudulent activity in his own firm.)" (Frish. Decl. at p. 8);

    h. "(The receiver claims I considered Biz radio a loss leader, and that FJK borrowed money from BIzradio.)" (Frish. Decl. at p. 8);

    i. "The receiver claims that "there was a pattern that existed over many years of profligate spending," and presents my testimony in the deposition as evidence of this." (Frish. Decl. at p. 12);

    j. "(The receiver implies that there is something wrong with WB investing in Biz radio.)" (Frish. Decl. at p. 13);

    k. "The Receiver claims that KCM and FJS can be considered as unified because Kaleta used FJS employees for his own personal use." (Frish. Decl. at p. 15);

    l. "(The Receiver claims the Fingold Affidavit proves I did something wrong.)" (Frish. Decl. at p. 16);

    m. "(The Receiver asserts that FJS junior clerical employees being misappropriated by Kaleta proves KCM and FJS were one or should be considered as one.)" (Frish. Decl. at p. 18);

    n. "The Receiver claims that I was negligent because I trusted Kaleta" (Frish. Decl. at p. 19); and

    o. "The Receiver claims Kaleta was made compliance officer improperly, because he was unqualified for the job and constituted the "fox being put in charge of the henhouse."" (Frish. Decl. at p. 20);

2. Frishberg also generally cites to Exhibits of the Motion and Response, without citing with particularity the referenced portions of those exhibits which support his assertions. Without supporting his assertions through particular citation to the parts of these Exhibits, Frishberg's assertions which he purports are supported by these Exhibits cannot be considered and must be stricken. These inadequate citations to Exhibits include the following:

    a. Assertions citing Exhibits 10 and 11:

        i. Asssertions under the heading "(The Receiver confuses the story by equating those early times when FJS had a smaller amount under management and was earning fees that ran between $1 and $1.4 million per year, with later times when the firm was self-sufficient. (See exhibits 10 and 11)," (Frish. Decl. at p. 4);

      ii. "The receiver claims that 'there was a pattern that existed over many years of profligate spending,' and presents my testimony in the deposition as evidence of this. This is exactly the opposite of what I was saying in his deposition. After years of frugal management, only in period 4 and 5, Kaleta had the opportunity to run the day-to-day operations of the company due to my health problems and the fact that I was traveling and occupied with the work of increasing the revenues and value of Biz radio. He was, at that time, supervised only by Wallace, who was serving as temporary CEO while I tried to solve my health problems and continued with the duties only I could perform, such as TV and radio appearances and stock and bond management. Wallace's lack of knowledge of the system gave Kaleta leeway. My testimony referred to this later period, when the financials of the company show that no borrowing was necessary and when the company had already adopted a clear policy of expanding the company through means other than investment in infrastructure. (see my exhibits 10 and 11)," (Frish. Decl. at pp. 12);

      iii. "This was exactly the period when there was no logical reason or need for FJS to borrow money, since it had grown to roughly $3 million in fees per year, which was more than adequate to fund operations and have substantial profit.) See financial statements in Exhibits 10 and 11." (Frish. Decl. at pp. 19)

  b. Assertions citing Exhibit 8:

      i. "I suggested that a reasonable interest rate for such financing would be 11%, and that I would expect that there would be strict limits on loan-to-value. They agreed on a maximum of 60% loan-to-value for an 11% note, and 70% loan-to-value for a 12% note. In the term sheet, (Exhibit 8) it was clearly stated that "Each Individual Investor in the Lender Pool shall share, on a *pari pasu* basis, in all collateral rights, including the rights in the Bank Account, of all Individual Investors." These were also the terms presented to me by Wallace, when he proposed the loans to me in a meeting in my office. Based on this term sheet, I did not use my discretion to allocate investor funds to these loans." (Frish. Decl. at p. 14);

      ii. "When I learned that Wallace had not observed the provisions of the term sheet, but had switched to some other terms, I contacted Wallace and also contacted all the clients involved in those notes to inform them of this switch. I met personally with Wallace to inform him that this would not stand, and encouraged him to change the terms of the notes to reflect the pools value of all WB partnership assets, as had been provided for in the meeting I had

      had with Wallace. (See term sheet exhibit 8.)" (Frish. Decl. at p. 15)

   c. Assertions citing Exhibit 15: "Richard Reilly, a client and supporter of Biz radio, and a top executive, contacted me to complain about the note being forced on his aged mother by Kaleta. (See Exhibit 15 ) The letter in the exhibit clearly demonstrates that Reilly knew that I did not know and had nothing to do with Kaleta loaning activities. Reilly worked with me on his newsletter, and his daughter was an employee in the office, so he understood how our company was structured. He specifically was happy for FJK to manage his mother's stocks and bonds, but claimed to have specifically told Kaleta not to get his mother involved with his financing activities. When I learned of this through the letter in the exhibit, I began to fear that Kaleta might have been having a nervous breakdown because it was impossible to see how he could have expected to get away with this. I also learned about other loans he had made, one to a person with a very small net worth, who had cancer. It had never been my impression that Kaleta was reckless. When I learned about these situations, I cut off all connection with Kaleta and KCM even though that would mean the end of Bizradio operations." (Frish. Decl. at p. 15);[2]

   d. Assertions citing Exhibits 9 and 14:

      i. "In 2008, I asked a group of experienced private equity people, who were investors in Biz radio, to look at all the operations and make recommendations on how the company could be brought to profitability more quickly, and the value optimized. That group was headed by Douglas Shaffer. They presented their analysis, suggesting that it would be difficult to make Biz radio profitable on its own, but that a holding company could be created, which would own both Biz radio and FJS, and that that company, combining the financials of the two companies would be immediately profitable. In order to do that it would be necessary for the owners of DFFS to sell stock, on favorable terms to the holding company, most likely with much of that payment coming in the form of Biz radio or holding company stock. I agreed to do this, and this was at the heart of my attempt to reorganize the company, selling some of the station hardware and the Houston radio station to Salem Broadcasting by separate agreement that would allow the company to continue, profitable. (see Exhibits 9 and 14.)." (Frish. Decl. at p. 21)

      ii. "As negotiated, the company would have been able to start fresh with adequate capital for the new startup, would have very low

---

[2] It should further be noted that all assertions reliant on Exhibit 15 should be stricken from the record because no Exhibit 15 was filed by Frishberg.

       expenses, and a good business plan, programming enough to carry the company for at least 3 years, giving it time to attain critical mass. This proposal was shown to the SEC, who said they do not 'bless' plans in advance but that they would make no move to prevent this arrangement and had no objections they could voice at the time. (See the agreement that was pending with Salem and the pro formas or projections of financial performance for the operation that would continue. Exhibits 9 and 14.)." (Frish. Decl. at p. 22);

e. Assertions citing Exhibit 17:

　　i. "Barrington hired Elisea Frishberg at a very modest pay, providing her a desk in a closet. In 2011 Barrington chose to terminate Mrs. Frishbergs employment, and did so with impunity. Again, if there had actually been anything resembling a sale, Barrington would have been obligated to continue her compensation, but he did not have to do that. Following that, Mrs. Frishberg's production company and I personally continued to provide advertising for Barrington on the radio show she produced, and we continued to write and produce advertising and commercials, write newsletters, and produce other materials for marketing. See Exhibit 17. Kaleta paid via retainer, and Invoices were provided to Barrington for all services. The above describes all compensation paid by Barrington to either Daniel or Mrs. Frishberg." (Frish. Decl. at p. 27)

　　ii. "As is clear from the small sample of work in Exhibit 17, this was important and skilled work, to assist the business in its growth plans. These are only small examples of the voluminous writing and producing for Barrington, including writing scripts, producing programs. Also did an "inner circle video magazine" for Barrington, called the INNER CIRCLE. It was subscribed to and earned thousands of subscription dollars for Barrington. Ln 2010/2011 Barrington earned all the subscription fees. Numerous luncheons, seminars, radio spots etc. were also produced for Barrington." (Frish. Decl. at p. 28)

f. Assertions citing Motion Exhibit L: "Exhibit L shows a large number of KCM notes to his creditors, which showed KCM as the maker, all signed by Kaleta, and showing his home address as the address of KCM. There is no sign of any participation by me. The notes were signed by Kaleta, using a signature stamp, which demonstrates that that was a method that Kaleta used to sign the notes." (Frish. Decl. at p. 11);

g. Assertions citing Exhibit 18: "Exhibit 18 shows possible future revenues of the combined companies as proposed to Salem broadcasting and to the receiver, however the document describing the risks could not be created,

and therefore, no formal complete plan could be accepted by the clients. They did, however, approve of the idea, when the plan was discussed informally. Informally, the plan which had been initially developed by the investors, was shown to many of the other investors and noteholders of KCM. Although the details of who owns what, and disclosures of risk, etc. were not formalized into a bona fide offer, all involved responded positively to this plan, and many of them specifically called the receiver instructing him to allow the plan to be developed, rather than killing the company and leaving everyone with nothing except him. There could be no guarantee these results would be generated with no setbacks, the company had a good chance to be successful." (Frish. Decl. at p. 23);

    h. Assertions citing Exhibit 6: "In addition, Bizradio was also granted, though its valuable services, a stake in the office/retail building on the Sam Houston Tollway. See Exhibit 6. Again, this asset has been ignored by the Receiver, even though he has been informed of the valuable asset by Frishberg and his attorneys numerous times. In calculating the value of Bizradio and the growth of its value, these assets must be calculated." (Frish. Decl. at p. 24); and

    i. Assertions citing Exhibit 9: "When Kaleta's trouble with the SEC became known to the public, I was contacted by several of his investors, informing me that they were holding these KCM notes, and did not want to be caught in a receivership in which they suspected they would not be repaid. Some of the larger investors were involved in the consultation which resulted in the recommendation to combine the media company with the investment advisory firm under a holding company. See Exhibit 9." (Frish. Decl. at p. 25).

3. Frishberg further makes general references to deposition and examination testimony of himself, Kaleta, and William C. Heath, yet fails to cite the particular testimony which supports his assertions. Without supporting his assertions through particular citation to specific testimony, Frishberg's assertions which he claims are supported by testimony (or in which he claims that testimony raises a question of dispute over a material fact) cannot be considered and must be stricken. These inadequate citations to deposition and examination testimony include the following:

    a. Frishberg testimony:

      i. "From my deposition, I am quoted as referring to unnecessarily high salaries for employees, and exorbitant and unnecessary expenditures that accounted for the debt. This is again knowingly confusing different time periods. During the time that FJS was growing from $0 assets under management to approximately $2 million under management, the company was managed carefully and frugally." (Frish. Decl. at p. 12);

      ii. "The receiver claims that "there was a pattern that existed over many years of profligate spending," and presents my testimony in the deposition as evidence of this. This is exactly the opposite of what I was saying in his deposition." (Frish. Decl. at p. 12);

      iii. "My testimony referred to this later period, when the financials of the company show that no borrowing was necessary and when the company had already adopted a clear policy of expanding the company through means other than investment in infrastructure. **(see my exhibits 10 and 11)**" (Frish. Decl. at p. 12);

      iv. "Between overpaying the employees far more than was necessary, because they all would have agreed to much lower compensation, and the unnecessary purchase of built-in furniture and other such items, Kaleta ran up a big bill to himself, which was my point in the deposition." (Frish. Decl. at p. 12);

      v. "In my deposition, the point is made by Gene Besen that two of the FJS employees, Sonia Joao, and Warren Gunn worked on KCM contract with Kaleta. … I had no way to know and did not know that Gunn and Joao were being misused for Kaleta's private purposes." (Frish. Decl. at p. 18); and

      vi. "The more common definition [of goodwill], and the one I was going by when discussing this with Gene Besen and with Bill Heath, is the fact that people like you." (Frish. Decl. at p. 27).

  b. Kaleta Disposition testimony:

      i. "In his deposition Kaleta states that he chose to route the loan through his privately held company KCM, because he felt that gave him more control." (Frish. Decl. at p. 3);

      ii. "In his deposition [Kaleta] states: 1. That KCM was a company he owned before his association with me or FJS. 2. That for tax purposes he received his personal income in that entity. 3. He alone chose to use KCM for the bank credit line because he felt that gave him control. 4. He lists the address of KCM always at a Fort Bend County address – his residence – and never at the offices of FJS. 5. In his deposition he is clear that he kept all records at his

   home, not in the offices of FJS, even though there were clerical people at FJS offices to keep record straight, and it was the policy of FJS not to allow any files to be taken off-site for safety and confidentiality reasons." (Frish. Decl. at p. 4);

  iii. "In his testimony, Kaleta refers to [KCM funds used by Frishberg to purchase a home] as a loan, but that was not the nature of the deal." (Frish. Decl. at p. 5); and

  iv. "Joao was Kaleta's assistant in his service to FJS, not KCM, which he ran from another address, as he clearly states in his deposition and as is clear from the many exhibits of KCM documents, which list a Fort Bend county address as the office of KCM." (Frish. Decl. at p. 16).

  2) *Frishberg's Declaration Relies on Exhibits That Would Be Inadmissible Pursuant to Rule 56(c)(4)*

A declaration in support of a nonmovant's response to a motion for summary judgment "must … set out facts that would be admissible in evidence." FED. R. CIV. P. 56(c)(4). Frishberg relies on several Exhibits in his Response and Declaration which fail to cross the threshold of admissible evidence, and these Exhibits and the assertions which they purportedly support must be stricken. Frishberg states only that these Exhibits are "true and complete copies." Frish. Decl. at p. 1. These Exhibits include the following:

1. Exhibit 5 (Doc. # 35-9). This is a draft redline document of a purported BizRadio convertible promissory note. Frishberg has failed to establish a foundation on the source of this document, whether it is a business record, how it supports any assertions in the Frishberg Declaration, or how it refutes any material facts established in the Motion;

2. Exhibit 6 (Doc. # 35-10). This is a draft document which purports to be a binding term sheet regarding the conveyance of an interest in a commercial office building. Frishberg has failed to establish a foundation on the source of this document, whether it is a business record, how it supports any assertions in the Frishberg Declaration, or how it refutes any material facts established in the Motion. In fact the document is incomplete and unexecuted;

3. Exhibit 8 (Doc. # 35-12). This is purportedly a Term Sheet given to investors in certain Wallace and Bajjali related investment funds. Frishberg has failed to

establish a foundation on the source of this document, whether it is a business record, whether this document was actually given to investors, how it supports any assertions in the Frishberg Declaration, or how it refutes any material facts established in the Motion;

4. Exhibit 9 (Doc. # 35-13). This is purportedly a draft business plan regarding the consolidation of BizRadio and DFFS. Frishberg has failed to establish a foundation on the source of this document, whether it is a business record, whether this document was actually presented to anyone, how it supports any assertions in the Frishberg Declaration, or how it refutes any material facts established in the Motion;

5. Exhibit 14 (Doc. # 35-17). This is purportedly a draft purchase agreement between BizRadio and South Texas Broadcasting, Inc. Frishberg has failed to establish a foundation on the source of this document, whether it is a business record, whether this document was actually executed or the form in which it was executed, how it supports any assertions in the Frishberg Declaration, or how it refutes any material facts established in the Motion;

6. Exhibit 15. No Exhibit 15 was filed with the Response and it is not in the record. All assertions which are reliant on Exhibit 15 for support should also be stricken;

7. Exhibit 17 (Doc. # 35-11). This is purportedly work product created by the Frishbergs for Barrington Financial Advisors, Inc ("Barrington"). Frishberg has failed to establish a foundation on the source of this document, whether it is a business record, whether it was ever used by Barrington and how and in what manner, how it supports any assertions in the Frishberg Declaration, or how it refutes any material facts established in the Motion; and

8. Exhibit 18 (Doc. # 35-18). This is purportedly projected financials for a combined company which includes BizRadio and DFFS. Frishberg has failed to establish a foundation on the source of this document, whether it is a business record, who prepared it, the methods used to prepare it, how it supports any assertions in the Frishberg Declaration, or how it refutes any material facts established in the Motion.

### III. RELIEF REQUESTED

Receiver requests the Court strike the Frishberg Declaration as detailed above for the purposes of deciding the Receiver's Motion for Partial Summary Judgment, and to consider undisputed the material facts established in the Receiver's Motion which, in light of the stricken assertions, have not adequately been addressed by Frishberg in his Response.

Dated: December 2, 2013

Respectfully submitted,

THE TAYLOR LAW OFFICES, P.C.

By: _/s/ Andrew Goforth_____

Andrew M. Goforth
Texas State Bar: 24076405
goforth@tltaylorlaw.com

4550 Post Oak Place Drive, Suite 241
Houston, Texas 77027
Tel: 713.626.5300
Fax: 713.402.6154

COUNSEL FOR RECEIVER

## CERTIFICATE OF SERVICE

On December 2, 2013, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Southern District of Texas, using the CM/ECF electronic filing system. I hereby certify that I have served all counsel of record electronically or by other means authorized by the Federal Rules of Civil Procedure.

    /s/ Andrew M. Goforth
Andrew M. Goforth